**BOBST DIVISION OF BOBST CHAMPLAIN, INC., Plaintiff,**

v.

**IML–FREIGHT, INC., Defendant.**

**No. 80 Civ. 5637–CSH.**

United States District Court,
S.D. New York.

June 21, 1983.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff; George Chandler, Anthony Pruzinsky, New York City, of counsel.

Apruzzese & McDermott, for defendant; Merritt T. Viscardi, New York City, of counsel.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

At the conclusion of plaintiff's case, I dismissed the complaint with prejudice. This Opinion sets forth my reasons.

Plaintiff Bobst Division of Bobst Champlain, Inc. ("Bobst") is a New Jersey corporation. Its corporate parent is Bobst S.A., a Swiss corporation ("Bobst S.A."). Bobst S.A. manufactures heavy machinery at its plant in Lausanne, Switzerland. Plaintiff Bobst is concerned with sales of the machinery to customers in the United States.

The Longview Fibre Company of Fridley, Minnesota is a customer of Bobst's. Longview purchased a paper box machine from Bobst. The machine, which is very large, was packed in fourteen separate cases, containing its component parts, and entrusted by Bobst to defendant IML-Freight, Inc. ("IML") for carriage by truck from the Port of New York to Longview's plant in Minnesota. IML picked up the cases of machinery at the pier to which they had been discharged from the M.S. ATLANTIC COGNAC which had performed the ocean carriage. IML received the shipment under a uniform straight bill of lading (PX2). During transit, the cases were transferred from IML to trucks belonging to Admiral Merchants Motor Freight, Inc., which then delivered them to Longview. IML received a

clean receipt from Admiral. Upon arrival at Longview's plant in Minnesota, case number 11 was found to be broken, and the piece of machinery contained therein damaged. The machine was surveyed on behalf of Bobst's underwriters on January 31, 1978. Not later than one or two days thereafter, John Kowalski, the sales superintendent at Bobst in New Jersey, was aware that the machine could not be repaired in the United States. The choice therefore lay in abandoning the machine for scrap value, or in returning it to Bobst S.A. in Switzerland for repairs. Sensibly, Bobst decided upon the latter course.

The damaged machinery was an integral part of the entire machine. Without the damaged part, nothing would work. Time was of the essence for Bobst's client, Longview. Accordingly Bobst gave priority to having a replacement part sent from Switzerland to Longview as quickly as possible. The damaged part was destined to be returned to Switzerland, repaired, and then resold to someone else.

Kowalski was responsible for collecting the documents to support a claim on Bobst's underwriters. To that end, he had several telephone conversations with Ron Mardenly, the terminal manager for IML at North Bergen, New Jersey. With Mardenly's assistance, Kowalski obtained a copy of Admiral's receipt evidencing delivery to the consignee, dated January 24, 1978, claused to reflect damage to the crate in question. According to the time stamp, Kowalski at Bobst received this document from Mardenly on February 16, 1978. This is the only document Kowalski could recall receiving from Mardenly pursuant to that request.

During his conversations with Kowalski, Mardenly sensed an uncertainty on Kowalski's part with respect to the procedures to be followed for filing a claim against the carriers. Mardenly advised Kowalski "you'd better send us a letter notifying us." Mardenly had not been involved in any

claims with Kowalski previously. Regarding Kowalski as a valued customer, Mardenly's purpose was in trying to give Kowalski assistance if the latter wanted to "start the proceedings." Mardenly did not forward any claims forms to Kowalski; nor did he suggest the text of any letter that Kowalski might write.

In point of fact, Kowalski did write Mardenly a letter (PX4). It is dated March 23, 1978. I reproduce its text in full:

Mr. R. Mardenly
I.M.L. Freight Company
3445 Paterson Plank Road
North Bergen, New Jersey 07047
Subject: Machine damage to BOBST Model SPO1600 with 2-Color Flexo
Longview Fibre Company, Minneapolis, Minnesota
Reference: Vessel MS "Atlantic Cognac"
Bill of Lading No. 3—dated December 12, 1977

Dear Mr. Mardenly:

Please be advised that the above referenced machine which arrived in Port Newark on or about December 26, 1977 was found to be damaged. The estimated amount of damage is approximately $100,000.00.

By notice of this letter, we hold your company liable for said damages. A claim will be filed on our behalf by our insurance company, who will contact you regarding this shipment.

Sincerely,
BOBST CHAMPLAIN, INC.
John Kowalski
Supervisor,
Sales Administration

Mardenly did not respond to this letter, he forwarded it to IML's office in St. Paul, Minnesota, where claims are processed. Mardenly was an area terminal manager. His duties did not include the adjustment of claims.[1]

---

1. Defendant's previous motion for summary judgment indicated, in its attached documents, that its general claims manager, Stephen H. Lee, took the position that Kowalski's letter did not constitute "a proper claim." That reaction appears in a letter dated June 14, 1978 which Lee sent to Admiral, the delivering carrier. It is clear from the context of the letter that Lee was challenging the contents of the letter as not conforming to minimum filing require-

This letter of March 23, 1978 from Kowalski to Mardenly is the only writing which could arguably be regarded as a notice of claim filed with either carrier within nine months after delivery of the property, as required by the statutory and regulatory scheme to which I will shortly come.

It appears from the documents before me that the damaged machine lingered in the United States until May 3, 1978, when it was placed on board a plane at JFK Airport, New York, for transportation to Lausanne. The machine arrived in Lausanne on May 8, 1978. Before undertaking repairs, Bobst S.A. wished to obtain a survey of the damage and repair cost estimate from underwriters' surveyors. A written survey report describes the damage, and expresses the opinion that repair costs totalling Sw. Fr. 19,194.10 would be fair and reasonable. (PX10). The preamble to the survey report contains this paragraph:

> The unit was returned to Messrs. Bobst S.A. in Lausanne for repair, and on 30th June, 1978 they contacted our Lausanne Agency and requested a survey. Two surveys were held, first at the Malley Depot and then at the Consignee's premises in Lausanne, on 5th July and 28th August, 1978.

The repairs were put in hand by Bobst S.A. following the second survey on August 28, 1978. Bobst S.A. forwarded its repair invoice and related charges (in a somewhat higher amount) to Bobst in New Jersey in late December, 1978. Bobst paid its parent company's charges, thereafter forwarding the invoice to its insurance brokers in New York. Eventually the precise amount of the claim was forwarded to IML.

IML defends on the ground that a written notice of claim containing the minimum filing requirements, 49 C.F.R. § 1005.2(b), was not filed in writing with the receiving or delivering carrier within nine months after delivery of the property, as required by paragraph 2(b) of the uniform bill of lading and the underlying statute, 49 U.S.C. § 11707(e) (Supp. II 1978).[2] Bobst contends that its written notice of claim of March 23, 1978 passes muster under the regulatory requirements. Alternatively, Bobst argues that the circumstances excuse its failure to file a sufficiently detailed claim within the nine-month period. For the latter proposition, Bobst seeks support in *Pathway Bellows, Inc. v. Blanchette,* 630 F.2d 900, 905 n. 10 (2d Cir.1980), *cert. denied,* 450 U.S. 915, 101 S.Ct. 1357, 67 L.Ed.2d 340 (1981).

The threshold issue is the sufficiency of Kowalski's letter of March 23, 1978. That question is determined by reference to 49 C.F.R. § 1005.2, the Second Circuit having held in *Pathway* that "the regulations provide the appropriate standard for assessing the sufficiency of all claims irrespective of the way they may subsequently be resolved or adjudicated." 630 F.2d at 904. The regulation provides in pertinent parts as follows:

> (b) Minimum filing requirements. A written or electronic communication (when agreed to by the carrier and shipper or receiver involved) from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and: (1) Containing facts sufficient to identify the baggage or shipment (or shipments) of property, (2) asserting lia-

---

ments, rather than the timeliness of the claim. The letter shows that a copy was sent to Kowalski. In plaintiff's successful opposition to the summary judgment motion, Kowalski swore that he had never received a copy of this letter. In view of my present disposition of the case, I need not resolve that issue. While Lee's letter of June 14, 1978 assumed the timeliness of the claim, defendant was not foreclosed from raising the issue at trial, having squarely raised the issue in the proposed findings of fact and conclusions of law filed and served when the case was marked trial ready.

**2.** Paragraph 2(b) of the uniform bill of lading provides in pertinent part:

> "As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier ... within nine months after delivery of the property.... Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid."

bility for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage; provided, however, that where claims are electronically handled, procedures are established to ensure reasonable carrier access to supporting documents.

\* \* \* \* \* \*

(d) Claims filed for uncertain amounts. Whenever a claim is presented against a proper carrier for an uncertain amount, such as "$100 more or less," the carrier against whom such claim is filed shall determine the condition of the baggage or shipment involved at the time of delivery by it, if it was delivered, and shall ascertain as nearly as possible the extent, if any, of the loss or damage for which it may be responsible. It shall not, however, voluntarily pay a claim under such circumstances unless and until a formal claim in writing for a specified or determinable amount of money shall have been filed in accordance with the provisions of paragraph (b) of this section.

█ It is clear from the plain wording of the regulation that the letter of March 23, 1978 is inadequate; although that inadequacy is not as extreme as IMF suggests.

█ A notice of claim must do three things: (1) identify the shipment; (2) assert that the carrier is liable for damage; and (3) claim payment "of a specified or determinable amount of money. . . ." IMF contends that the March 23, 1978 letter does none of these things. I disagree in respect of the first two.

IMF's argument in respect of insufficient identification of the shipment proceeds from the fact that the letter is captioned with the ocean bill of lading, rather than the inland, motor carrier's bill of lading.

But it is entirely clear from the evidence that IMF's internal procedures enabled it without difficulty to identify the particular inland shipment. Armed with knowledge of the ocean bill of lading number, IMF picks up the property at the ocean carrier's pier. That generates the documents which gives to the shipment the inland carrier's own identifying numbers. Kowalski's March 23, 1978 letter is prefaced not only by the ocean bill of lading number, but by reference to the machine model and Longview as consignee. All the regulation requires is that the notice of claim contain "facts sufficient to identify" the shipment. The best proof of the notice's adequacy in this regard is that Mardenly had no difficulty in identifying the shipment on the basis of what Kowalski told him.

IMF next argues that the letter should not be regarded as a claim at all, but as the harbinger, in the manner of John the Baptist, of a message yet to come. But the letter contains the explicit statement, on behalf of Bobst, "we hold your company liable for said damages." That is sufficient to satisfy the second minimum requirement of the regulation.

The letter in the case at bar differs, in that regard, from the initial letter sent by the claimant in *Pathway,* the text of which appears in the margin.[3] Of that letter, Judge Sand could accurately say for the district court that "it failed to assert that [the carrier] was liable for any loss. . . ." 630 F.2d at 903. Such an assertion clearly appears in the letter in this case.

The inadequacy of the March 23, 1978 letter lies in its failure to make "claim for the payment of a specified or determinable amount of money. . . ." The Court of Appeals in *Pathway* paraphrases the requirement to be a claim for "a specified or ascertainable amount of money as damages." *Id.* at 903. Presumably the Second Circuit saw no difference between "determinable amount" and "ascertainable

---

**3.** The initial letter sent by the claimant in *Pathway Bellows* read as follows:

"Although we have contacted your company earlier, the purpose of this letter is to state,

in writing, that we are in the process of filing a claim for freight damage of a shipment to Gouverneur Ironworks, Oswego, New York."

amount"; counsel for the parties at bar suggest no difference, and I can perceive none.

The March 23, 1978 letter recites: "The estimated amount of damage is approximately $100,000.00." Clearly Bobst does not in this letter make claim for a "specified amount." What does "determinable" mean in this context? I conclude that it means an amount determinable, as a matter of mathematics, from a perusal of the documents submitted in support of the notice of claim. That interpretation is strengthened by the provisions of 49 C.F.R. § 1005.2(d), which I read to apply precisely to the sort of claim for "uncertain amounts" involved in this case. That subsection of the regulation refers to a claim "for an uncertain amount, such as '$100 more or less....'" That is just the sort of claim with which I am concerned; and the last sentence of the subsection, as we have noted, provides that the carrier shall not voluntarily pay a claim:

> ... under such circumstances unless and until a formal claim in writing for a specified or determinable amount of money shall have been filed in accordance with the provisions of paragraph (b) of this section.

This can only be read as an indication that a claim for an "uncertain amount" cannot be regarded as constituting compliance with the minimum filing requirements contained in subsection (b).

If I am correct in concluding that the March 23, 1978 letter is inadequate, then Bobst's only hope of salvation lies in the suggested lifelines appearing in *Pathway's* concluding footnote, at 630 F.2d 905 n. 10. Because of the vise-like grip with which Bobst fastens upon that footnote, I reproduce it in full:

> Had any conduct on the part of Penn Central misled Pathway Bellows into believing that there was no need to file a claim, or that the letter of May 12, 1975 was sufficient to constitute a claim, Penn Central might be held estopped from insisting on Pathway Bellows's compliance with the timely written claim requirement contained in the bill of lading. *See,*

*e.g., Perini-North River Associates v. Chesapeake & O. Ry.,* 562 F.2d 269, 272–73 (3d Cir.1977). Similarly, if Pathway Bellows could not, in the exercise of reasonable diligence, have ascertained the extent of its loss within the 9 month claim filing period, untimely filing of a completed claim might be viewed as excusable. See *ex Parte No. 263, supra,* 340 I.C.C. at 554–55.

Nothing in the present case, however, indicates that the reason for the untimely submission of Pathway Bellows's claim was attributable to either of these factors or to any factors beyond Pathway Bellows's control.

I do not understand Bobst, on the completion of its case in chief, to place any reliance upon the first of these two potential lifelines, namely, estoppel. Certainly Mr. Chandler, plaintiff's able and imaginative counsel, did not urge the point to me in summation; and there was no basis in fact or in law upon which he could do so. The most the evidence on the point shows, viewing it in the light most favorable to plaintiff, is that Mardenly suggested that Kowalski write him a letter, and indicated that the claim would be followed up. Mardenly did not undertake to suggest what the contents of the letter should be; nor, having received it, did he say anything to assure Kowalski that it was sufficient. Of course, Mardenly lacked actual authority to give any such assurance; nor, as a terminal manager with whom Kowalski had had no prior dealings in respect of claims, could Mardenly be fairly perceived by Kowalski as having apparent authority in this aspect of IML's business. In these circumstances, Mardenly's silence following his receipt of the March 23, 1978 letter cannot be said to have misled Kowalski in either of the respects referred to in the first sentence of the *Pathway* footnote. Estoppel, within the context of the mandatory, statutory and regulatory scheme, should not be lightly found. Certainly the Third Circuit case to which the Second Circuit referred in the *Pathway* footnote, *Perini-North River Associates v. Chesapeake & O. Ry.,* 562 F.2d 269,

272–73 (3d Cir.1977), bears no meaningful resemblance to the case at bar. In *Perini,* the carrier's representatives specifically advised the claimant's representative that no further written claim need be filed, since a claim satisfactory to the carrier had already been filed. That representation, together with other departures by the carrier from established procedures with which the claimant was familiar, combined in the view of a majority of the Third Circuit panel (one judge dissented on the point) to estop the carrier from rejecting as untimely the claim eventually filed. The case at bar is entirely different on the facts.

I come, then, to the only issue of any substance in the case. It is whether, on the facts revealed by the evidence, Bobst can bring itself within the second lifeline suggested by the *Pathway* footnote, which I will paraphrase for the sake of the following discussion:

> If Bobst could not, in the exercise of reasonable diligence, have ascertained the extent of its loss within the 9-month claim filing period, untimely filing of a completed claim might be viewed as excusable.

As authority for that proposition, the Second Circuit in *Pathway* cited a lengthy report of the Interstate Commerce Commission which formulated the regulations in question. *Ex parte No. 263: Rules, Regulations, and Practices of Regulated Carriers With Respect to the Processing of Loss and Damage Claims,* 340 I.C.C. 515 (1972). The pertinent discussion from that report appears at pp. 554–55. It reads as follows:

> ... we should initially describe in our regulations that which we consider to be the minimal requirements of a properly composed claim and also, for the edification of those directly affected, that which we believe falls short of that mark. For example, the filing of preliminary claims for unstated amounts, filing claims for a specified dollar amount "more or less," or the filing of notices of intention to file claims have presented claimants and some carriers with problems over the years. We believe that the rule of reason

requires the situation of the claimant and the opportunity afforded a carrier to investigate a claim must both be considered and reconciled here. Unquestionably, if the contract of carriage dictates (as is required by section 2 of the uniform domestic straight bill of lading) that a claim be filed within 9 months, then it certainly behooves a claimant to file within that time because otherwise his claim may be barred. On the other hand, there are times when it is impossible for a claimant to determine accurately the amount that should be claimed. The purpose of a reasonable limitation period is to enable a carrier to investigate the factual situation giving rise to a claim while recollections are still possible and records continue to be available. The actual amount of the claim is not essential immediately to enable a carrier to institute its investigation and, while it should ordinarily be included in the claim, inclusion of the amount claimed is directory rather than absolute. Such amount should, of course, be made known to the carrier as soon as it becomes available in those instances where a claim has earlier been filed.

These considerations gave rise to the regulations in 49 C.F.R. § 1005.2, whose pertinent provisions I have previously quoted.

In the case at bar Bobst concedes, as it must, that the Kowalski letter of March 23, 1978 did not claim a payment of a specified or then determinable amount of money. Bobst points out that the cost of repairs could not be determined, and thus stated specifically, until the machine had been returned to Switzerland for repair. I accept this proposition as true. The machine's external casing was observed to be fractured at the time of delivery. Various moving parts dwelt within the casing. I am persuaded by the evidence that it was not feasible to attempt further inspection and repair in the United States. Bobst made the sensible choice in returning the machine to Lausanne for repair. It was also sensible, in the circumstances, for Bobst to have the damage surveyed by underwriters' representatives in Switzerland before commencing repairs. With all this I have no

quarrel in principle. The problem arises out of the leisurely pace at which Bobst put these principles into practice.

As noted, over three months elapsed between delivery of the machine in Minnesota and its departure from JFK for Lausanne on May 3, 1978. The machine arrived in Lausanne on May 8. Bobst S.A. did not even contact underwriters' representatives to request a survey until June 30. The machine was then surveyed on July 5 at the "Malley Depot," whatever and wherever that may be. I may infer that the facilities at the depot did not permit a sufficiently thorough inspection, because the machine was surveyed again at Bobst S.A.'s premises in Lausanne. This survey did not take place until August 28. The repairs commenced sometime thereafter, although the documents in evidence do not reveal when they actually began or were completed.

■ Under the *Pathway* footnote, to excuse its untimely filing Bobst bears the burden of showing that it "could not, in the exercise of reasonable diligence, have ascertained the extent of its loss within the 9 month claim filing period." I conclude on these facts that Bobst has not sustained its burden. I need do no more than point to the chronology of events, which speaks for itself.

Mr. Chandler made two essential arguments on behalf of Bobst. The first was that all the *Pathway* footnote required was "reasonable diligence" to ascertain the amount of the loss. From that proposition, counsel argued that Bobst was not required to "drop everything," interrupt its normal business, and give an unreasonable and disruptive priority to making the repairs. There are two flaws with this argument, which has as its basic premise the contemporaneous demands placed upon the Lausanne plant. The first flaw is that the conditions at the plant, whatever they were, had nothing to do with the prolonged delays between discovery of the damage in Minnesota and shipment of the machine from New York; or between arrival of the machine in Switzerland and completion of the underwriters' surveys. These two periods

of delay, which so far as the evidence reveals are entirely unrelated to plant conditions, take us all the way to August 28, 1978, thereby consuming seven of the nine months allowed to state a claim.

The second flaw is that there is no evidence of plant congestion or conditions which would have prevented earlier repair. The only witness who could speak to conditions at the Lausanne plant was Mr. Kowalski. He had visited the plant on several occasions, but candidly and forthrightly claimed nothing more than a general impression of its procedures. Mr. Chandler undertook to fill the gap in the proof by arguing to me what the conditions at the plant must have been, but of course I cannot permit him to do that. There is, in short, no showing that Bobst could not, with reasonable diligence and without commercial embarrassment to itself, have ascertained the amount of its loss well within the nine-month period.

Mr. Chandler's second argument proceeded from that sentence in the I.C.C. report which says that the amount of the loss "should, of course, be made known to the carrier as soon as it becomes available in those instances where a claim has earlier been filed." Counsel argues that the Bobst interests made the amount of repairs and related expenses known to the carrier as soon as, at the end of the chronology which I have recounted, those figures became "available." I accept this as true; but I cannot agree that in doing so Bobst met its obligation under the bill of lading, the statute, and the regulation.

During argument I put particularly to Mr. Chandler the question of whether a claimant in Bobst's position was under any time limitation at all in ascertaining the amount of its loss and making that figure available. His response was, in essence, an invocation of the equitable doctrine of laches. Accepting that Bobst should perhaps have moved more quickly, Mr. Chandler argued that IML had received preliminary notice of the claim, commenced its investigation, and had not shown any prejudice as

the result of Bobst's delay in making known the precise figure.

In my view, the doctrine of laches has no part to play in this case. Laches is a creature of equity. Typically, it determines the staleness of claims in the absence of any statute of limitations. If there is no applicable limitations period, the Court inquires whether the plaintiff has unreasonably delayed in asserting his claim and whether the defendant has been prejudiced by the delay, both elements being necessary to the establishment of the defense. But here the bill of lading, enacted pursuant to statute, contains a nine-month limitation period within which the claimant must file a proper claim. Thus there *is* a specific limitations period. The I.C.C. report reminds claimants that in view of that limitation period, "it certainly behooves a claimant to file within that time because otherwise his claim may be barred." 340 I.C.C. at 554. The Commission goes on to observe that "there are times when it is *impossible* for a claimant to determine accurately the amount that should be claimed." *Ibid.* (emphasis added). The analysis upon which Bobst relies then follows, ending in the sentence upon which counsel places particular reliance. But my interpretation of the I.C.C.'s analysis, viewed in its entirety, is that timely filing is excused only if circumstances rendered a filing within nine months "impossible"; so that a claimant who has it within its power to ascertain the amount of the loss and make it available to the carrier within nine months must do so. Certainly that is the interpretation which the Second Circuit seems to adopt in the *Pathway* footnote, previously quoted; and my conclusion is strengthened by the concluding paragraph of that footnote, which reads:

> Nothing in the present case, however, indicates that the reason for the untimely submission of Pathway Bellows's claim was attributable to either of these factors or to any factors beyond Pathway Bellows's control.

No reference to prejudice to the carrier appears in this analysis. Indeed, in *Pathway* the claim was received only one day late, and was held barred; no one suggested that a showing of prejudice was necessary to sustain the defense of late filing. Bobst has not shown that the untimely submission of its claim was attributable to a factor beyond its control. Its own evidence compels the contrary conclusion.

Defendant's motion to dismiss the complaint at the end of plaintiff's case is accordingly granted.

The Clerk of the Court is directed to dismiss the complaint with prejudice, and with costs to defendant.

It is So Ordered.