**LTA GROUP, INC., Plaintiff,**

v.

**J.B. HUNT TRANSPORT, INC., Defendant.**

**LTA Group, Inc., Plaintiff,**

v.

**Consolidated Rail Corporation, a/k/a Conrail, Defendant.**

**No. 1:99–CV–656.**

United States District Court, N.D. New York.

June 21, 2000.

Bouck, Holloway, Kiernan & Casey, Albany, New York, for plaintiff, Brian D. Casey, of counsel.

McNamee, Lochner, Titus & Williams, P.C., Albany, New York, for defendant J.B. Hunt, G. Kimball Williams, of counsel.

Barry N. Gutterman & Associates, New York City, for defendant J.B. Hunt, Barry N. Gutterman, of counsel.

Debrot & Siris, LLP, Manhasset, New York, for defendant Consolidated Rail Corp., Michael J. Siris, of counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff LTA Group, Inc. ("plaintiff") contracted for the shipment of goods which became damaged while being transported in interstate commerce. Plaintiff initially filed two separate actions which were formally consolidated into the instant lawsuit. Plaintiff f.¹ ¡d the first action against defendant Consolidated Rail Corporation, a/k/a Conrail ("Conrail"), who had custody of the goods at the time they were damaged. The action against defendant J.B. Hunt Transport, Inc. ("J.B. Hunt"), who arranged for the transportation of goods by Conrail, was commenced in New York State Supreme Court, and later removed to federal court on motion of J.B. Hunt. In its consolidated action, plaintiff seeks damages pursuant to the Interstate Commerce Act, 49 U.S.C. §§ 11706 and 14706 ("the Carmack Amendment"), in the amount of $169,836.64, reflecting the alleged actual cash value of the losses incurred, combined with the deductible imposed by plaintiff's insurer.

Both defendants have moved for summary judgment dismissing the action as to each pursuant to Rule 56 of the Federal Rules of Civil Procedure. Oral argument was held on January 28, 2000, in Albany, New York. Decision was reserved.

## II. FACTS

### A. Background

The essential facts are not in dispute. In January 1996, plaintiff and J.B. Hunt entered into a contract for the shipment of goods in interstate commerce by motor carrier. Prior to August 6, 1996, plaintiff placed in J.B. Hunt's care certain goods owned by plaintiff's clients Benetton and Barnes & Noble. J.B. Hunt commenced transportation of the goods by highway, and also made arrangements with Conrail for transportation of the goods by train. The shipment was to be transported from Bergen, New Jersey, to Eagan, Minnesota, and was scheduled for delivery on August 8, 1996. The Conrail train transporting the goods, however, derailed on August 6, 1996 near Schenectady, New York, damaging the cargo.

Plaintiff alleges that due to the damage caused by the derailment, and by virtue of its contractual obligations to its clients, it sustained a loss of $169,836.64. See Am. Compl. ¶ 13. Plaintiff's insurer, Hartford Fire Insurance Company ("The Hartford") apparently made a payment to Benetton in the amount of $41,449.44, and a payment to Barnes & Noble in the amount of $103,387.20. According to plaintiff, The Hartford's payments reflect the actual cash value of the goods damaged in the derailment, and The Hartford is now subrogated to plaintiff's right of recovery against defendants. On top of the cash value loss, plaintiff is also seeking recovery of its $25,000.00 deductible. See Ashton Aff. ¶ 4. Plaintiff also provides that Barnes & Noble's insurer, Royal Insur-

ance Company ("Royal Insurance"), made an additional payment to Barnes & Noble, reflecting the difference between the retail price of the goods and the actual cash value. The additional payment by Royal Insurance is not part of plaintiff's claim.

### 1. *Notice to J.B. Hunt*

On September 23, 1996, William Ashton, an employee with a company affiliated with The Hartford, contacted J.B. Hunt to discuss the loss, and was purportedly informed that J.B. Hunt was "currently investigating this matter" and that Mr. Ashton should submit a letter to the claims department. Ashton Aff. ¶ 8. A letter to J.B. Hunt's claims department dated September 23, 1996, purports to notify J.B. Hunt of a Conrail derailment occurring on or about August 6, 1996, whereby "the cargo" was damaged. The letter does not claim a specified sum of money, but requests that a claim be "set up" and that J.B. Hunt contact the signatory, Mr. Ashton. *See* Ashton Aff.Ex. 3.

A representative from J.B. Hunt responded by letter dated October 3, 1996, stating that pursuant to its tariffs, it would adhere to the rules and regulations governing freight claims, as follows: first, that a claim be submitted within the time requirements of the bill of lading contract, and that it "(1) contain facts sufficient to identify the baggage or shipment; (2) assert liability for the alleged loss or damage; and (3) make claim for the payment of a specified or determinable amount of money."[1] Whitehead Aff.Ex. 2. The letter further stated: "When your client's claim is presented, meeting the above qualifications it will be entered into our system, assigned a J.B. Hunt claim number and be given consideration for payment." *Id.* Plaintiff apparently never responded to this letter.

On April 10, 1997, another employee with The Hartford wrote a letter to National Union Fire Insurance Company, the insurer for J.B. Hunt. The letter states "I am presenting a claim for the above amount and request the proper file number and handler information in order to send supporting documents." Robuck Aff. Ex. 2. The Hartford claims $169,836.64 as the amount of loss, based on its having made payments to plaintiff, on behalf of plaintiff's customers ($66,449.44 for Benetton and $103,387.20 for Barnes & Noble). It then explains, "[y]our insured picked up cargo from my insured and placed it on a Conrail railroad car. The railroad car derailed and cargo was damaged." *Id.*

### 2. *Notice to Conrail*

Conrail's Exempt Trailvan Rules Circular # 1, incorporated by reference into the relevant agreement between Conrail and J.B. Hunt, provides as follows:

> Claims shall be filed with Conrail in writing within one year of date of delivery or a reasonable time of delivery, and shall include a copy of shipping order (bill of lading), invoice, inspection report, or other proof of shipment, and, if possible, paid freight bill.

Mesler Aff. ¶ 5.

Conrail was in custody of plaintiff's goods at the time of the derailment on August 6, 1996. Conrail's internal reports, specifically a document entitled "Conrail Electronic Mail System Damage Prevention And Claims Services Department Derailment/Unusual Occurrence Report," reveal that it dispatched an investigator to the scene of the derailment within one hour of its occurrence. Casey Aff.Ex. G. Conrail's report further indicates that prior to the derailment, plaintiff's goods were transported in trailer number JBHU 209325; and following the derailment, the damaged goods were transferred to trailer number TIPZ 223208 (and apparently delivered on or about August 9, 1996). *Id.* Conrail has submitted an affidavit from one of its managers stating that "[i]t is true that Conrail knew of and actually

---

1. The letter erroneously cites to 49 C.F.R. § 1005.1(b) rather than 1005.2(b).

investigated the aforesaid derailment." Mesler Aff. ¶ 9.

A memorandum prepared by The Hartford dated September 4, 1996, recounts the circumstances surrounding the derailment and includes as the final item, "Future disposition will include placing JB Hunt and the rail company on notice." Mesler Aff.Ex. L. According to Mr. Ashton's affidavit, he spoke with a Conrail employee on September 19, 1996, who purportedly stated that he was aware of the derailment and that J.B. Hunt had already filed claims with Conrail—although not necessarily for the goods shipped by plaintiff on behalf of Benetton and Barnes & Noble. *See* Ashton Aff. ¶ 9.

There appears to be no written correspondence with Conrail from either The Hartford or plaintiff until Steven Lewis, an employee of The Hartford, sent a letter to Conrail Claims Services dated October 27, 1997. This letter references plaintiff as the insured, the date of loss, and the amount of loss, as well as stating that it would look to Conrail for reimbursement regarding its subrogation claim (although it does not explicitly name the shipper or trailer number). *See* Lewis Aff.Ex. B. Conrail's form response letter of November 17, 1997, requests further information "as there is nothing in the 'file' to indicate Conrail's involvement." *Id.* Ex. C.

A series of written exchanges ensued between The Hartford and Conrail. Mr. Lewis responded to Conrail with a letter dated January 16, 1998, purporting to enclose supporting documents, and referencing trailer number TIPZ 223208. *See id.* Ex. D. By letter of January 28, 1998, Conrail informs Mr. Lewis that it has no record of handling trailer number TIPZ 223208, and notes that Royal Insurance had previously submitted a claim for the same trailer number. *See id.* Exs. E, F. On June 8, 1998, The Hartford received a statement of loss and damage claim activity from Conrail. The document is dated May 29, 1998, and suggests that The Hartford's claim was on active status. *See id.* Ex. G. Finally, by letter dated July 8, 1998, Conrail advises that the shipment left Conrail's possession on August 9, 1996, and The Hartford's claim was received on January 16, 1998, thereby exceeding the 12–month filing requirement provided in Conrail's Exempt Trailvan Rules, Circular # 1, by which the subject shipment was moved. Conrail accordingly maintained its disallowance of The Hartford's claim. *See id.* Ex. H.

In addition to other correspondence from or on behalf of Royal Insurance which make no reference to any dollar amount of claim (*see* Casey Aff. Exs. C and D), Royal Insurance submitted a letter to Conrail dated May 19, 1997, as subrogee of Barnes & Noble. The letter purports to put Conrail on notice of its subrogation demand for its claim, and demands payment of damages amounting to $59,837.31,[2] based on the Conrail derailment of August 6, 1996. *See id.* Ex. E. Conrail's internal documents likewise reveal that a claim was filed by Royal Insurance, as subrogee of Barnes & Noble, for goods damaged in the derailment. *See id.* Ex. B. Royal Insurance a/s/o Barnes & Noble brought suit against Conrail and others in the Supreme Court of the State of New York, County of Nassau, for damages to the Barnes & Noble portion of the subject shipment, which was ultimately discontinued with prejudice by stipulation of the parties. *See* Mesler Aff. ¶ 6, Ex. I.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary Judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56;

---

**2.** This amount was derived from the difference between the cost of the Barnes & Noble books damaged in the derailment and their resale value.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *See Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. *The Carmack Amendment*

Both defendants are subject to, and the matters in dispute are governed by, the Carmack Amendment which codifies a qualifying carrier's liability for goods lost or damaged in shipment. *See* 49 U.S.C. §§ 11706 (liability of rail carriers) and 14706 (liability of motor carriers). The defendant carriers are also subject to the regulations promulgated thereunder by the Interstate Commerce Commission (the "ICC"). *See* 49 C.F.R. § 1005.1 *et seq.* Under the Carmack Amendment, liability for goods damaged in shipment may be imposed upon the receiving carrier, the delivering carrier, and the carrier over whose line or route the goods were transported. *See* 49 U.S.C. §§ 11706(a) and 14706(a). These statutes authorize carriers to impose upon shippers a notification period for filing claims, but prohibit the carriers from imposing a period of "less than nine months for filing a claim." *See* 49 U.S.C. §§ 11706(e) and 14706(e)(1).

The ICC rules, set forth in the Code of Federal Regulations (the "C.F.R."), establish the minimum filing requirements for a claim for loss or damage against interstate carriers. *See Pathway Bellows, Inc. v. Blanchette*, 630 F.2d 900, 904 (2d Cir. 1980); 49 C.F.R. § 1005.2(b). Paragraph (a) of § 1005.2 provides that a claim for loss, damage, injury or delay to cargo "shall not be voluntarily paid by a carrier unless filed, as provided in paragraph (b) of this section. . . ." Paragraph (b) mandates that at a minimum, a written or electronic communication must be filed with the carrier and: (1) contain facts sufficient to identify the shipment(s) of property; (2) assert liability for the alleged loss, damage, injury or delay; and (3) make claim for the payment of a specified or determined amount of money. 49 C.F.R. § 1005.2(b).[3]

These notice of claim rules serve "to allow carriers to construct a reliable record of potential liabilities, and to facilitate prompt investigation of claims by carriers". *Imperial News Co. v. P–I–E Nationwide, Inc.*, 905 F.2d 641, 644 (2d Cir.

---

**3.** Subsection (d) provides that where a claim is filed against a carrier for an uncertain amount, the carrier must ascertain the extent of the loss or damage for which it may be responsible, but "shall not, however, voluntarily pay a claim under such circumstances unless and until a formal claim in writing for a specified or determinable amount of money shall have been filed in accordance with the provisions of paragraph (b) of this section."

1990) (internal citations omitted). "In applying these requirements, courts should liberally construe the nature of the writing required to determine whether a claim has been made." *Consolidated Rail Corp. v. Primary Indus. Corp.,* 868 F.Supp. 566, 578 (S.D.N.Y.1994) (*citing Georgia, Florida & Alabama Ry. v. Blish Milling Co.,* 241 U.S. 190, 198, 36 S.Ct. 541, 60 L.Ed. 948 (1916)). Whether proper notice of claim has been filed may be determined as a matter of law and summary judgment is therefore a proper means to resolve this issue. *See id.* at 575 n. 8.

Notably, writings have not been so "liberally construed" as to frustrate the Second Circuit's policy of full adherence to the enumerated ICC requirements. In *Pathway Bellows,* the leading case in this Circuit regarding the ICC claim filing regulations, the Court of Appeals found a letter inadequate in form to constitute a written claim. *See Pathway Bellows,* 630 F.2d at 904. While the letter notified the carrier that it was filing a claim for freight damage of a particular shipment, the letter failed to assert that the carrier was liable for any loss and failed to claim a specified amount of money as damages (elements (2) and (3) of the ICC rules). *See id.* at 903. The Court further held that a subsequent letter which met the formal requirements, but which was received one day after the nine month period had expired, was also insufficient. *See id.* at 902.

The Court justified its rigid adherence to form in part on the fact that the ICC regulations also:

> [I]mpose numerous obligations upon carriers, which are triggered by the receipt of a 'claim.' Having thus required a carrier to take certain actions once a claim is received, we think it is neither inappropriate nor beyond the authority of the ICC at the same time to provide a carrier with some guidance as to what constitutes a claim, so that a carrier may know one when it sees one.

*Id.* at 904. In accordance with these principles, the Second Circuit later noted that "[i]t is in the interests of all parties to interstate carriage that the provisions of the Interstate Commerce Act and the regulations of the ICC be applied consistently and predictably ... [in this way the parties to contracts of carriage] can adjust their affairs to those rules and provide the most efficient means for reducing that risk." *Imperial News,* 905 F.2d at 643. In *Nedlloyd Lines, B.V. Corp. v. Harris Transp. Co., Inc.,* 922 F.2d 905, 907 (1st Cir.1991), the First Circuit followed *Pathway Bellows* in mandating strict compliance with ICC regulations whether or not the claim is contested, commenting that adhering to the regulations "encourages [the] voluntary resolution [of claims] by ensuring that both shipper and carrier have adequate information to evaluate liability and the extent of damages". *Id.* at 908.

Subsequent cases in the Second Circuit have, in accordance with *Pathway Bellows,* adhered to the ICC requirements and found inadequate notice where the shipper's written claim fails to include a determinable sum of money. *See, e.g., Home Ins. Co. v. Rail Express, Inc.,* 865 F.Supp. 183, 187 (S.D.N.Y.1994) (granting summary judgment for carrier, and stating that "[a]ccording to the law in this Circuit, the claim must be filed within the nine month period and it must contain the specific dollar amount of damages."); *Bobst Division of Bobst Champlain, Inc. v. IML–Freight, Inc.,* 566 F.Supp. 665, 669 (S.D.N.Y.1983) (letter which met first two ICC requirements but stated that the "estimated amount of damage is approximately $100,000.00" was found not in compliance); *Insurance Co. of N. Am. v. S/S "TRANSWORLD BRIDGE",* No. 92 Civ. 7375(LMM), 1994 WL 75249, at *4 (S.D.N.Y. March 7, 1994) (where no monetary amount was included in preliminary claim, "[a] fortiori, such a claim does not satisfy the standards promulgated by the ICC."); *Norton Spiel Assocs., Inc. v. Carolina Freight Carriers Corp.,* No. CV 89–2317(RR), 1991 WL 318804, at *4

(E.D.N.Y. Feb. 11, 1991). Indeed, while some Circuits (most notably the Seventh and Ninth) have relaxed the determinable damage requirement, "this Circuit has not." *Consolidated Rail,* 868 F.Supp. at 579 (*citing Pathway Bellows,* 630 F.2d at 904); *see also Nedlloyd Lines,* 922 F.2d at 907 (agreeing with Second Circuit that compliance with ICC notice provisions "is an essential prerequisite to recovery in an action at law.")

Moreover, courts in the Second Circuit uniformly hold that a shipper filing a claim must conform with all three ICC requirements even where the carrier had actual notice that the shipper's goods were damaged or undelivered. Indeed, in *Pathway Bellows,* the Court of Appeals held the shipper's claim barred even though the carrier had investigated the damage and filled out a damage report on the shipment's arrival at its destination. *See Pathway Bellows,* 630 F.2d at 901. Rather than look to what the carrier knew, or should have known, about the facts surrounding the claim, courts instead hold that "the notice that [the shipper] provided in writing to [the carrier] is controlling." *Consolidated Rail,* 868 F.Supp. at 572 n. 5; *see also Davis Acoustical Corp. v. Carolina Freight Carriers Corp.,* 775 F.Supp. 530, 535–36 (N.D.N.Y.1991) (inspection report in carrier's possession did not offset shipper's failure to sufficiently identify the shipment in its claim because "a carrier's actual or constructive knowledge is irrelevant in assessing a claim under [49 C.F.R. § 1005.2(b) ]."); *Imperial News Co., Inc. v. P–I–E Nationwide, Inc.,* 727 F.Supp. 86, 89 (E.D.N.Y.1989), ("this Court holds that the nine month filing period requirement does not make exception for the carrier's knowledge of the facts."), *aff'd,* 905 F.2d 641 (2d Cir.1990); *R.T.A. Corp.,* 594 F.Supp. at 209–10 ("the [ICC] regulations, which are followed in the Second Circuit, make no exceptions to compliance with any of their provisions in the case of actual knowledge by the carrier.").

This line of reasoning stands in contrast to that of the Ninth Circuit, the prevailing law of which warrants discussion in light of plaintiff's reliance thereon. In *Taisho Marine & Fire Ins. Co., Ltd. v. Vessel "Gladiolus,"* 762 F.2d 1364 (9th Cir.1985), the court assessed whether adequate notice was provided to the carrier under a standard of "substantial compliance" with ICC regulations. *Id.* at 1368–69. The court noted in its discussion of the case law that the written notice requirement may be relaxed where the carrier has actual notice and conducts a full inquiry. The court, however, ultimately found that the consignee had not provided adequate notice as it failed to put the carrier on notice of its intent to seek compensation from the carrier. *Id.* In *Culver v. Boat Transit, Inc.,* 782 F.2d 1467, 1469 (9th Cir.1986), the court, while maintaining that written notice was still a requirement, similarly held that more informal written notice was acceptable where the carrier had actual knowledge and had conducted an investigation: "After *Taisho,* a written notice of damage, coupled with a clearly communicated intent to hold the carrier liable, plus the carrier's investigation, suffices as a written claim." *Id.* The Ninth Circuit has expressly rejected the Second Circuit rule that a claim must specify the amount of damages to be considered legally sufficient under the ICC regulations. *See Insurance Co. of N. Am. v. G.I. Trucking Co.,* 1 F.3d 903, 906 (9th Cir.1993).

While the Ninth Circuit's "substantial compliance" standard conceivably embraces a variety of mitigating circumstances, *Pathway Bellows* lists, in a footnote, just two which are capable of excusing full compliance: (1) where a carrier misleads a shipper as to the necessity or adequacy of a claim, possibly warranting estoppel; or (2) a shipper is prevented from exercising reasonable diligence in filing its claims. *See Pathway Bellows,* 630 F.2d at 905 n. 10; *accord, Home Ins. Co.,* 865 F.Supp. 183, 187 (explaining that "this Circuit has set out very limited reasons for why an untime-

ly filing is excused"). With respect to the first exception, it has been noted that "[f]or plaintiff to prevail on an estoppel theory, it would have to prove that defendant's employees made misleading representations and that plaintiff failed to file a timely claim as a result of its reliance on those representations." *R.T.A. Corp. v. Consolidated Rail Corp.,* 594 F.Supp. 205, 210 (S.D.N.Y.1984).

■ Significantly, "[e]stoppel is not to be found lightly" and will only be applied in compelling circumstances. *Imperial News,* 905 F.2d at 645 (*citing Bobst,* 566 F.Supp. at 669). In *R.T.A. Corp.,* the defendant-carrier had inspected a damaged shipment, and in response to the shipper's inquiry, advised that the shipper's claim had already been rejected. The shipper, believing that filing a written claim would be pointless, did not file one. The court granted the carrier's motion for summary judgment, holding that the shipper was not excused from its duty to file a written claim. The court emphasized that the carrier had not explicitly represented to the shipper that a proper statement of claim need not be filed. *See R.T.A. Corp.,* 594 F.Supp. at 210; *see also Consolidated Rail,* 868 F.Supp. at 579–80 (carrier's letters to shipper denying liability did not warrant estoppel).

### 1. *J.B. Hunt*

■ With respect to J.B. Hunt's motion, plaintiff does not contest that nine months was the applicable period by which it was contractually obligated to file its claim against J.B. Hunt. For purposes of this motion, it is assumed that the terms and conditions of the motor carrier contract entered into between plaintiff and J.B. Hunt (*see* Am.Compl. ¶ 5) or other relevant contract, in some form included a nine

month limitation or was based on or incorporated the ICC-mandated Uniform Straight Bill of Lading, which limits the notice period to nine months from delivery.[4] Accordingly, whether plaintiff's notice was proper within a nine month time frame will be addressed.

Plaintiff's letter to J.B. Hunt dated September 23, 1996, clearly does not meet the minimum requirements for notice under 49 C.F.R. § 1005.2(b). First, rather than identifying the shipment, the letter merely refers to "the cargo." Second, the letter does not expressly purport to assert liability for the alleged damage to the cargo. And finally, there is no claim for payment of a specified sum of money. *See Pathway Bellows,* 630 F.2d at 904; *Insurance Co. of N. Am.,* 1994 WL 75249, at *4; *Bobst Div.,* 566 F.Supp. at 669. Plaintiff, however, contends that the exceptions set forth in the *Pathway Bellows* footnote, along with cases from other Circuits, demonstrate that strict compliance with ICC regulations is not necessary, and therefore notice was adequately supplied based on The Hartford's letter and telephone communications.

Plaintiff's argument is flawed. To read the *Pathway Bellows* footnote so broadly would swallow its holding entirely. Nor is the Court inclined to accept the proposition that *Pathway Bellows* is in harmony with case law of other Circuits which have adopted more relaxed standards. In fact, as noted above, the referenced *Pathway Bellows* footnote posits only two situations by which the ICC rules could be relaxed, and neither is applicable here: (1) plaintiff has expressly disavowed any reliance on an estoppel argument; and (2) plaintiff fails to even remotely suggest that any obstacle existed to prevent its acting more

---

4. The Carmack Amendment merely provides that a carrier cannot require notice of a claim in any period less than nine months, but does not itself establish a particular time period. The C.F.R. states that a claim must be filed within the time limits established in the bill of lading or contract of carriage or transporta-

tion. 49 C.F.R. § 1005.2(b); *see Dress Barn, Inc. v. LTA Group, Inc.,* 822 F.Supp. 88 (D.Conn.1993) (declining to grant carrier's motion for summary judgment on action under Carmack Amendment where plaintiff alleged there was no bill of lading or other agreement pertaining to notice requirements).

diligently in providing a proper written claim to J.B. Hunt.

The letter of April 4, 1997, although also within the nine month time frame, was sent by plaintiff's insurer's affiliate, The Hartford, to J.B. Hunt's insurer, National Union Fire Insurance Company of Pittsburgh, Pennsylvania (who is not a party to this action). As such, it does not constitute notice to J.B. Hunt. In addition, the gist of The Hartford's letter is that "I am presenting a claim for the above amount and request the proper file number and handler information in order to send supporting documents." The letter notes that the goods were in Conrail's possession at the time of the derailment, but does not expressly assign liability for the damages to either J.B. Hunt or Conrail. Even read in a light most favorable to plaintiff, therefore, this letter does meet the second element required by 49 C.F.R. § 1005.2(b).

Moreover, it is not insignificant in this case that plaintiff was afforded clear notice of the ICC requirements, as set forth in J.B. Hunt's letter of October 3, 1996. The October 3, 1996 letter informed Mr. Ashton that: "[w]hen your client's claim is presented, meeting the above [ICC] qualifications it will be entered into our system, assigned a J.B. Hunt claim number and be given consideration for payment." This letter conclusively demonstrates that J.B. Hunt did not engage in any misleading conduct. Rather, J.B. Hunt went beyond its legal obligations and offered plaintiff the appropriate standard by which its notice of claim would be considered. *See, e.g., Imperial News,* 727 F.Supp. at 89 (carrier has no duty to notify shipper of contractually imposed requirements). The fact that J.B. Hunt actually advised plaintiff of its duties only renders plaintiff's unexplained delay more inadequate.

Because the Second Circuit mandates that claims be assessed in light of the ICC regulations, and it is patently apparent they were not met here, summary judgment must be granted as to J.B. Hunt.

### 2. *Conrail*

Plaintiff does not offer any evidence that it (or The Hartford) communicated its claim in writing to Conrail within the twelve-month period prescribed by Conrail's contract. Rather, the first writing provided is from The Hartford and dated October 27, 1997 (the twelve month period would have expired on or about August 9, 1997). Accordingly, plaintiff relies on an amalgam of events which it claims constitute sufficient notice either independently or *in toto:* (1) preliminary communications by telephone between The Hartford and Conrail; (2) documents evidencing Conrail's internal investigation of the derailment; (3) letters from Royal Insurance to Conrail on behalf of Barnes & Noble, seeking damages for lost profits; and (4) Conrail's written communications with plaintiff after the expiration of the twelve month period. Plaintiff again argues that it provided timely and proper notice to Conrail under a relaxed enforcement of 49 C.F.R. § 1005.2(b), or alternatively, that Conrail waived its right to enforce the twelve month limitation when it purported to investigate plaintiff's claim after twelve months had passed (i.e., following receipt of The Hartford's letter dated October 27, 1997).

First, with regard to the initial discussions by telephone, it bears mention that as with J.B. Hunt, plaintiff explicitly disclaims reliance on an estoppel theory as against Conrail. It is assumed, therefore, that plaintiff does not take the position that it was misled by Conrail into believing there was no need to file a formal written claim. In any event, plaintiff has not offered any facts tending to demonstrate that Conrail ever advised plaintiff that it did not have to file a written claim, or that plaintiff intentionally delayed filing a written claim based on any such statements. *See Imperial News,* 905 F.2d at 645. Because verbal communications cannot otherwise be used to meet the ICC regulations in this Circuit, statements allegedly made by plaintiff to Conrail employees regarding

its claim do not in themselves constitute adequate notice to Conrail.

Turning to evidence of written notice, the only communications provided within the twelve month period are three letters from Royal Insurance on behalf of Barnes & Noble. Only one, dated May 19, 1997, arguably meets the ICC claim filing requirements. Nevertheless, even assuming proper form with respect to Royal Insurance's claim, this letter names only Barnes & Noble as the insured, with no reference to plaintiff or Benetton. The letter places the amount of loss at $59,837.31 (which plaintiff has explained constitutes Barnes & Noble's lost profits on the sale of the damaged cargo). Considering that the Second Circuit has consistently rejected writings which contain proper notice except omit or merely estimate the amount of damages sought by the claimant, this Court declines to hold that a letter from a party other than the claimant, referencing different damages than those sought here, would constitute sufficient notice of the latter. Moreover, the letter fails to indicate that it relates to, much less represents, any interest of plaintiff. And it fails to mention the Benetton shipment, an essential portion of plaintiff's claim. *See Delphi Frosted Foods Corp. v. Illinois Cent. Ry. Co.*, 188 F.2d 343 (6th Cir.1951) (plaintiff who has not filed a claim may not rely on the claim of another).

Accordingly, the only potential relevance of the Royal Insurance letters and the telephone calls would be, in conjunction with the evidence of Conrail's internal investigation and fact of its custody of plaintiff's goods at the time of derailment, as evidence of Conrail's actual knowledge of plaintiff's claim. Plaintiff argues, essentially, that if Conrail had actual notice of all pertinent facts of the derailment and damage, a formal written notice of claim would have provided no additional benefit—Conrail already had sufficient information to the process the claim. Clearly, Conrail had actual knowledge of the derailment and the fact that certain cargo was damaged—indeed, Conrail has admitted as much. Nevertheless, this Court is bound first and foremost to the law of the Second Circuit, not the Ninth.

■ Under Second Circuit authority, plaintiff's written communications are dispositive on the issue of proper notice, unless one of the enumerated exceptions set forth in *Pathway Bellows* is met. Here, plaintiff failed to demonstrate compliance with ICC regulations because it provided no written notice whatsoever to Conrail in the relevant twelve month period. It was plaintiff's burden to ensure its own proper compliance with the regulations regardless of Conrail's silence on the matter or the amount of telephone interaction between the parties (absent affirmatively misleading statements). *See R.T.A. Corp.*, 594 F.Supp. at 211; *Royal Ins. Co. of Am. v. DHL Worldwide Express*, No. 98 Civ. 3743(RPP), 1999 WL 494118 (S.D.N.Y. July 13, 1999), *aff'd*, 205 F.3d 1324, 2000 WL 232766 (2d Cir.2000); *Norton Spiel Assocs.*, 1991 WL 318804, at *5. As noted above, the Second Circuit has not allowed a carrier's actual knowledge to make up for deficiencies in a shipper's written claim. Accordingly, however valid the reasoning of *Culver* and *Taisho* may seem, the Court declines to apply their holdings in contravention of Second Circuit precedent.[5]

■ Finally, the Court is not persuaded by plaintiff's argument that Conrail's communications with plaintiff following the twelve month limitation period somehow triggered an extension of plaintiff's time to provide written notice by virtue of waiver

---

5. Significantly, considering the absence of any writing generated by either plaintiff or The Hartford to Conrail within twelve-months from delivery of the goods, it is not clear that plaintiff met the minimum filing requirements even under the Ninth Circuit standard. Further, not only did plaintiff fail to submit a writing, but there is likewise no evidence of "a clearly communicated intent to hold [Conrail] liable" within the applicable time period. *See Culver*, 782 F.2d at 1469.

or otherwise. " 'Waiver is an intentional relinquishment of a known right and should not be lightly presumed.' " *Royal Ins.*, 1999 WL 494118, at *7 (citations omitted). Here, even affording plaintiff the benefit of all favorable inferences, plaintiff has not raised a material issue of fact that Conrail intended to abandon its contractual rights by investigating and responding to plaintiff's belated inquiries. In addition, plaintiff cites no authority in support of its theory that additional communications with the carrier may eradicate contractually imposed filing obligations, and it seems clear that applying such a rule would seriously undermine the regulatory scheme imposed by the ICC.

In light of plaintiff's failure to meet the ICC minimum requirements in its claim against Conrail, Conrail's motion for summary judgment must also be granted.[6]

## IV. *CONCLUSION*

Defendants have shown that there is no genuine issue of material fact that plaintiff failed to submit valid written claims within the contractually prescribed time periods, and that this failure was not excusable.

Accordingly, it is

ORDERED that

1. The defendant J.B. Hunt Transportation Inc.'s motion for summary judgment is GRANTED;

2. The defendant Consolidated Rail Corporation, a/k/a Conrail's motion for summary judgment is GRANTED;

3. The complaint is dismissed in its entirety; and

4. The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

**6.** Conrail raised an additional argument in its reply brief, that plaintiff's action should be dismissed for its failure to include The Hartford as a real party in interest. Having re-

solved both defendants' motions on the basis of insufficient claims filing, however, the Court does not reach this issue.